UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------X

ALEXANDER JAYANTY,

                        Plaintiff,

  -against-

ST. GEORGE'S UNIVERSITY, LTD., SGU LTD
d/b/a ST. GEORGE'S UNIVERSITY, and
UNIVERSITY SUPPORT SERVICES LLC,

                      Defendant.

-------------------------------------------------------------X

**COMPLAINT**

**JURY TRIAL DEMANDED**

The Plaintiff ALEXANDER JAYANTY, by his attorney, STEWART LEE KARLIN,

complaining of Defendants, ST. GEORGE'S UNIVERSITY, LTD., SGU LTD d/b/a ST.

GEORGE'S UNIVERSITY, (hereinafter SGU) and UNIVERSITY SUPPORT SERVICES LLC

(hereinafter USS) alleges upon information and belief as to all other matter, as follows:

## NATURE OF THE CLAIM

1.     This is a civil action based upon Defendant's violation of the American with Disabilities

       Act (ADA) by discriminating against Plaintiff due to his disability and perceived

       disability, by failing to reasonably accommodate Plaintiff's disability and perceived

       disability, by failing to engage in the interactive process and due to retaliation.

## PARTIES JURISDICTION AND VENUE

2.     At all times hereinafter mentioned, Plaintiff ALEXANDER JAYANTY ("Plaintiff" or

       Mr., Jayanty), was a student enrolled at SGU and was subject to insidious discriminatory

       conduct within the Eastern District. The Plaintiff has a disability and perceived disability

       (ADHD, and Anxiety Disorder) pursuant to Section 504 and the ADA and participated in

1

protected activity pursuant to Section 504 and the ADA. Plaintiff has a mental impairment that substantially limits one or more major life activities as set forth below, had a record of such an impairment and was regarded as having such an impairment. Plaintiff was discriminated against due to his disability, and perceived disability and retaliation for complaining about discrimination as set forth below.

3.     Defendants SGU and USS are foreign corporations that conduct a significant amount of the business in the State of New York.

4.     The amount in controversy exceeds the minimum jurisdiction of this Court.

5.     This court has jurisdiction over the subject matter of this proceeding pursuant to pursuant to 28 U.S.C. § 1331.  In addition, Plaintiff invokes the supplement jurisdiction of this Court pertaining to the State law claims pursuant to 28 U.S.C.  § 1367.

6.     Upon information and belief, Defendant SGU is a recipient of federal financial assistance as defined by Section 504 (29 U.S.C. 794) and the regulations promulgated thereunder. 34 C.F.R. § 104.33.

7.     Defendant SGU offers a variety of programs and services for students that have disabilities in order for the student to gain access to their education in the State of New York. Plaintiff is a qualified individual with a disability in that he met the essential requirements for the receipt of services and reasonable accommodations.

8.     Upon information and belief, Defendant USS is corporation that in all respects is controlled by Defendant SGU and exists solely in an attempt by SGU to avoid jurisdiction in the State of New York. Defendant USS participated in the decision to terminate Plaintiff and otherwise discriminated against him.  At all times relevant,

2

Defendant USS was acting as agent with actual and apparent authority on behalf of Defendant SGU.

9.      Defendants SGU and USS were advised of Plaintiff's disability and was provided a medical documentation throughout his enrollment with SGU.

10.     This action properly lies in the Eastern District as the claims arise within this District.

11.     Plaintiff has exhausted all internal administrative remedies and has satisfied all conditions precedent to filing a lawsuit.

## FACTUAL STATEMENT

12.     On or about August 1, 2011, Plaintiff duly enrolled at SGU.  At the time of SGU's enrollment, he advised SGU that he had a disability to wit: Attention Deficit Hyperactivity Disorder-Predominantly Hyperactive Impulsive Type and a Learning Disorder NOS Related to Processing Speed weaknesses.

13.     Plaintiff was accepted to St. George's University to the AEP program.  He was on academic probation for one year. This program is unique to St. George's University for students with academic deficiencies. SGU agreed to provide extra test time and a distraction free room.

14.     Plaintiff attended weekly meetings and group discussions throughout his first year on how ADHD manifests itself related to the learning process incorporating the gamut of planning and organizing tasks, materials and surroundings.

15.     Plaintiff had to overcome two aspects of executive function; one was behavioral regulation which means maintaining control of behavioral and emotional responses and metacognitive skills by direction attention and developing problem solving efforts.

16.   Some of his behavioral regulations involve shifting thinking or behavior from one thing or an aspect of a problem to another, regulating his emotions, stopping behavior when he wanted to and monitoring his own behavior and its effect on others. The metacognitive skills involve initiating activity (procrastination), monitoring his performance on tasks; develop his working memory, organizing materials, surroundings and planning tasks and activities.

17.   Plaintiff used all the behavioral tools that he had learned along with medication to be successful.  Plaintiff had several approved leaves and successfully completed his didactic coursework in August 2014 and commenced his clinical rotations in early September 2014.

18.   As set forth below, Defendants SGU's discriminatory and retaliatory treatment towards Plaintiff exacerbated his disability. Plaintiff received A's and Bs in multiple rotations. He passed his USMLE step 1 on the first attempt without extended time that he deserved, and received A's and B's in professionalism in many rotations and not once had a complaint from a single patient nor colleague outside of his rotation.

19.   In September 2014 Plaintiff commences his first rotation (OBGYN) at Lutheran Medical Center in Brooklyn, New York and received a passing grade of B.  Plaintiff had complained that he believed that he was being discriminated against and was not given the same opportunity in treating patients as his peers due to his disability. Plaintiff was given only 1 OB/GYN case on multiple days, when the other students in his group were given 3-4 cases. He was asked if he was on medication, and what medications he was on, he was even told that fetal heart tracings are too difficult for him to understand without even attempting to teach him or even seek to assess his ability to understand such. He

4

complained to his Medical Director, Dr. Kesavan, Laura Alfredo, Counsel for the hospital. After his complaints, he was called to see Dr. Dopkin, Assistant Dean of Medical Education in New York and because Plaintiff was 20 minutes late he was told that he was unprofessional.  He stated that he had no right to go to the hospital to complain about discrimination; Plaintiff told he had caused an administrative nightmare.

20.   He was supposed to stay at Lutheran Hospital to complete all his rotations and as result of his complaints he was removed from Lutheran Hospital and he went to Brooklyn Hospital instead.

21.   Thereafter, in November 2014, Plaintiff commenced his second rotation in Pediatrics at Brooklyn, Hospital and received a passing grade of A.

22.   Alex met with Dr. Ricciardi (Clinical Director for SGUO on Dec30, 2014. Dr. Ricciardi stated to Plaintiff " There is something inherently wrong with you. You are delusional to believe what you believe." "When you do things like this you ruin the reputation of the school." Dr. Ricciardi further stated: " They sent you to Brooklyn because I was here. To keep an eye on you.  That's why you are here- I should have met with you earlier. I will take the blame on that That's my fault." Dr. Ricciardi also stated:" It's just the matter that you are annoying individual so you know I have a daughter who gets like this you can't win every battle." "So, if you take that nickels piece of advice then you learn something if you don't then "take a gun and shoot yourself!"

23.   On January 5, 2015, Plaintiff contacted Ms. O'hagan, Disability Coordination with SGU and asked why he was not identified as a student with ADHD and therefore did not receive his extended time for his SHELF exams.

24.     Plaintiff did not receive accommodations for his NBME USMLE STEP 1 exam. He spoke to another student and she told him she received her accommodations of extended time. Alex was told that he was never identified to USS that he was a student who required accommodations. In fact, SGU did NOT advise USS in NY that Plaintiff was eligible for accommodations. Also, Plaintiff was never provided his reasonable accommodations for testing for the beginning part of his clinical rotations in New York.

25.     Thereafter, in January 2015, Plaintiff commenced his third rotation in Psychiatry at Kings County Hospital.  During the mid-rotation evaluation, Dr. Dopkin requested that he have an IME but withdrew his request.   Plaintiff received a passing grade of A.

26.     Thereafter, in February 2015, Plaintiff commenced his fourth rotation in Surgery at Brooklyn Hospital. He completed three weeks of rotation.

27.     On March 6, 2015 Plaintiff was dismissed from the rotation and SGU due to allegedly unprofessional conduct per the University Code of Conduct.  (His inability to accept constructive criticism) without a hearing contrary to the rules of SGU.

28.     Plaintiff was never advised of any deficiencies in his clinical performance and conduct prior to the sudden dismissal.

29.     The dismissal was in retaliation for Plaintiff complaints of discrimination. SGU dismissed Plaintiff without a judiciary hearing which is what their handbook states is protocol.

30.     Plaintiff duly appealed his dismissal.

31.    On March 27, 2015, Plaintiff was advised by SGU that he had been reinstated and placed on probation. SGU conditioned the reinstatement based on the requirement for Plaintiff to have an IME.

32.    On March 30, 2015 Alex is asked to meet with Dr. Ricciardi. During the meeting, Dr. Ricciardi tells Plaintiff he is annoying to everyone and he is a fuck up. It's not your email that's your problem it's you,  it's you, You're a FUCK UP, your taking fucking drugs(referring to my Adderall that I take for ADHD) Dr. Ricciardi states that that is speed and Alex tells him that he takes it because he has ADHD and this works best for him.  Dr.Ricciardi stated "I have ADHD and I don't take Shit." He tells him to make sure he does his IME and let him know the name and everything the doctor says. Dr Ricciardi says. "Be sure to waive all your rights for me to see it."

33.    Once the IME was completed and report was submitted, Plaintiff would have to meet with Dr. Dopkin during each of his future rotations to assess Plaintiff's progress.

34.    In April 2015, Dr. Richard Barrett submitted a medical report to SGU.

35.    On May 5, 2015, Plaintiff received a letter from SGU stating he could re-start his clinical rotation for Surgery at Brooklyn, Hospital.

36.    On May 9, 2015, Plaintiff continued his surgical rotation at Brooklyn Hospital until July 31, 2015, Plaintiff was advised to seek medical care which Plaintiff was doing on a regular with Dr. David Inwood.

37.     At that time, it was recommenced for Plaintiff that he be provided a schedule and syllabus as that would greatly aide him.  Plaintiff requested on at least three separate occasions to meet with Dr. Ricciardi, Dean of Clinical Studies for SGU regarding

accommodations that would be necessary for Plaintiff to succeed.  However, Plaintiff's requests were ignored.

38.   Plaintiff never received a written syllabus for surgery despite emailing Dr. Asarian requesting a syllabus as well as asking if re-starting the rotation would impact the Plaintiff negatively.  Dr. Asarian, who is the Surgery Chief as well as an Assistant  Clinical Dean for SGU calls Dr. Ricciardi  to complain that Alex is sending emails again.

39.   Plaintiff rejoined the surgery rotation on May 9,2015 and completed it with the required evaluations submitted. He received a poor evaluation from one resident and asked her if they could discuss the evaluation. Laura Poliakin, the resident, said she would meet with him later to discuss but then complained to the course director that she felt threatened.

40.   This allegation led to Plaintiff receiving a letter of suspension on July 31, 2015.  On July 31, 2015, the last day of his rotation, Plaintiff received a letter advising him that he was suspended with a notice of violation for alleging acting in way that would bring dishonor to SGU, and for unprofessional conduct.

41.   Plaintiff was never advised of any deficiencies in his clinical performance and conduct prior to his sudden suspension. However, he did not receive his grade in Surgery until January 2016. Plaintiff received a grade of B in Surgery rotation. In fact, Alex was allowed to take the Shelf Exam on August 6, 2015.

42.   In September 2015, Dr. Dan V. Iosifescu (psychiatrist and Professor of Psychiatry and Neuroscience-Icahn School of Medicine-Mount Sinai) issued a report concerning Plaintiff that was provided to SGU.  In the report, Dr. Iosifescu requested a leave of absence for three months. Dr. Iosifescu also advised that Plaintiff was also suffering from

8

General Anxiety Disorder. In addition to the accommodations that were also being provided, Dr. Iosifescu requested a single designated mentor who could help and advice Plaintiff with practical and clinical aspects of his clinical rotations, a written syllabus provided for each hospital's rotation requirements, and clinical feed-back session organized in a private, quiet environment.

43. Thereafter, on October 2, 2015, a report from Dr. David Inwood confirmed the diagnosis of General Anxiety Disorder and ADHD and recommending a leave of absence to treat his anxiety.

44. SGU approved the leave of absence on October 23, 2015 advising Plaintiff that he could have a three month leave of absence.

45. Plaintiff continued to seek treatment on a regular and consistent basis.

46. An error was made on his surgical grade which Plaintiff attempted to correct. The error consisted of marking a score of C on National Clinical Subject Examination (NCSE)when he received a B.  The NCSE counts for 20 percent of the surgical rotation grade.  Plaintiff made numerous attempts to correct grade but SGU did not promptly respond to the obvious error.  In February 2016, SGU belatedly provided Plaintiff credit for his Surgical Rotation and the grade was finally corrected on April 29, 2016.

47. Thereafter, on February 9, 2016, a report from Dr. David Inwood was provided and reiterated the necessity of a mentor.

48. On April 21, 2016, an additional report from Dr. David Inwood was provided.  The following accommodations were requested.

    a. A mentor who will meet with Plaintiff on a weekly basis to chart his mastery of academic curriculum and clarify any interpersonal issues that

9

might arise with house staff or the attending and assist with his clinical rotations.

b.  Extra test time in a distraction free environment.

c.  Plaintiff should be given a written syllabus for all rotations and directions for all assignment as he is a visual learner.  If an oral presentation is presented, Alex is to have an outline of the presentation along with a written copy of the lecturer's notes.

d.  Plaintiff's evaluations be collected for Plaintiff and placed in his mail box.

e.  Adjustments regarding the time to take the Step II CK and CS examinations as well as graduation.

49.  Thereafter, SGU attempted to place Plaintiff at Montefiore Hospital but that would not have accommodated Plaintiff due to requirements of weekly treatment with his doctors.

50.  As a result, Plaintiff was delayed in his placement and eventually was placed at Woodhull Hospital for the Internal Medicine rotation.

51.  Plaintiff was successful in his Internal Medicine rotation but an obvious error was made by SGU in his grading due to his disability and in retaliation for his complaining about discrimination.

52.  In fact, Plaintiff's grade in internal medicine did not reflect the evaluations he received. Plaintiff received more A's than B's in every category, however every category and his overall final evaluation was marked B.  In fact, the area for A is circled but then a B is put in place of the A.  Even his oral examination grade was changed to a B. He was told that he received an A and observed that the A was recorded.  More specifically, 7out 7 A's in medical knowledge averages out to an A but B is marked; 5 out 7 A's in

10

professionalism averages out to an A in professionalism but B is marked; 4 of 7 A's in clinical skills averages out to an A but B is marked.  Clearly, his grade in IM should be an A.   Internal Medicine rotation ended on or about July 31, 2016.

53.   Plaintiff commenced his fourth-year electives where he got to choose what rotations he will be assigned too.

54.   Thereafter, Plaintiff went to New York Methodist Hospital in a bariatric surgery rotation in August 2016.  Plaintiff received a passing a grade in the rotation and completed rotation on or about August 31, 2016.

55.   Thereafter, he stayed at New York Methodist Hospital in a gastroenterology rotation. Plaintiff was never advised of whether he passed the rotation and in fact was allowed to go to his next rotation at New York Methodist Hospital in endocrinology.  Normally, one is not allowed to advance to the next rotation if one does not receiving a pass score on one's current rotation and one is informed of such and told to retake it at another hospital, this however did not occur. .

56.   Thereafter, he stayed at New York Methodist Hospital in endocrinology rotation. Plaintiff was never advised of whether he passed the rotation and in fact was allowed to go to his next rotation at New York Methodist Hospital in cardiology. Normally, one is not allowed to advance to the next rotation if one does not receiving a pass score on one's current rotation.

57.   On or about October 21, 2016, he was advised by the Medical Director, Todd Simon that he was being dismissed.  For the first time, he was handed out his evaluations from gastroenterology and endocrinology.

58.     Thereafter, on November 3, 2016, Plaintiff received a letter advising him that SGU was recommending his dismissal.

59.     Thereafter, Plaintiff appealed the dismissal from SGU.

60.     Thereafter, on November 17, 2016, a report from Dr. David Inwood was provided regarding the reasonable accommodations including weekly meeting with his mentor, two weekly director observations of Plaintiff interviewing a patient, taking a history and writeups by rotating attending and senior resident, syllabus for each rotation provided on the first day of the rotation, feedback should be continuous all concerns should be addressed as they emerge and continuous treatment by Plaintiff.

61.     Thereafter, on or about November 25, 2016, Plaintiff was dismissed from SGU.

62.     Thereafter, on December 20, 2016, a report from Dr. David Inwood was provided regarding the reasonable accommodations

    a.      Alex should have a mentor during his rotations who will be meeting with him on a weekly basis.

    b.      There should be direct observation of Alex's interactions with patients as well as with medical students, house staff, residents, attendings and nurses.

    c.      Plaintiff should be given immediate feedback about any problematic behavior or adverse communication issues.

    d.      Protected time for Alex to meet with Drs. Inwood and Spielberg is crucial. Regular ongoing contact by the hospital and/or the school with by telephone and e-mail will help resolve issues as they may arise. '

    e.      Extra Test time and distraction free room for tests

12

f.      Plaintiff to use a smart pen during rounds and lectures or provide a note taker.

g.      CART technology should be available which allow him to read what is being said white the team is rounding because the cacophony of the hospital interferes with his ability or process quickly information being discussed.

h.      Alex, should be given written syllabuses of the clinical rotations.  Also, he functions best when given a thorough explanation of what is required, particularly when there may be a discrepancy between SGU requirements and hospital standards.

i.      Required readings, lecture schedules and responsibilities should be specific; not inferential or vague,

j.      Alex should have advance notice of the locations of lectures and their subject matter.

k.      Alex should be provided with copies of any lectures required by the hospital so that he can record and listen to the lectures as he writes and re-writes his notes. To the degree possible Alex should have written notes or an outline before the lecture.

l.      Changes should be made in written form or by text.  I urge that neither the school nor the hospital rely on verbal communications.   Written directives will ultimately benefit both Alex and whichever team or attendings he'll be assigned to.

13

m. An extended time line (decelerated schedule) or a modification of normal time line to obtain his degree due to suspensions und dismissal and remedying the issues will of necessity require an adjustment in Alexander's graduation time line.

n. When Alex is starting as new rotation he should be instructed and oriented to any special instruments that are part of the rotation. Alex should be oriented to the techniques of scrubbing and understanding of the sterile field.

o. A letter of academic support when applying for Step II C5 and CK exams to receive appropriate accommodations.

63. Defendant SGU failed to engage Plaintiff in the interactive process whatsoever until after Plaintiff had been dismissed from SGU on November 25, 2017.

64. There were no accommodations whatsoever provided on any of the rotations such as an onsite mentor. feedback, as quickly as reasonably possible, regarding any problematic behavior or adverse communication issues.

65. Plaintiff was not given protected time each week to meet with his healthcare providers.

66. Plaintiff was not provided required readings and lecture schedules in advance.

67. Plaintiff was not provided advanced notice of locations of lectures, and notice of the subject matter.

68. Plaintiff was not allowed to go to the GI clinic nor was he even told when the GI clinic was scheduled.

69. Plaintiff was not told about key dates, information, and the lecture schedule. Plaintiff was not provided a written syllabus.

70.   Also, SGU failed to consult with clinical directors and Plaintiff regarding the
accommodations he would need, his functional limitations and their impact on
completing the requirements of the rotation.  Further, the necessary hospital individuals
were not notified of Plaintiff's accommodations.

71.   Because of the failure to provide these accommodations, he received an F in
professionalism and thus an F in Endocrine.  This grade should be changed to Passing.

72.   Because of the failure to provide these accommodations, and the many errors contained
in the evaluation, he received an F in professionalism and thus an F in GI.  This grade
should be changed to Passing.

73.   Also, at the commencement of school with SGU, an individualized meeting should have
been held to address accommodations and plans to implement them.  This process never
took place prior to the start of Plaintiff's education at SGU.  SGU made decisions by
committee after reviewing his documentation, but did not engage Plaintiff in the
interactive process.  SGU did not make a good faith effort to engage in the Reasonable
Accommodation process which is a violation of the ADA and Rehabilitation Act.

74.   Regarding Gastroenterology, Plaintiff was never given a GI syllabus or any information
regarding GI, which is a typical practice in medical school and rotations, and is an
accommodation required to aid Plaintiff because of his disabilities. He was not provided a
schedule.  He was told to leave GI orientation on at least 3 separate occasions by Ms.
Aberdeen's' Assistant during his GI rotation.  Also, there were no written instruction or
information provided for his ADHD/anxiety accommodations.   In fact, no one was
informed of his disability.

75.     Regarding his GI evaluation, it was alleged that he was unable to acquire accurate and historical information in an organized and timely fashion. This assertion was false. Plaintiff acquired histories from Cerner and was not once reprimanded nor told his histories were not accurate. In fact, he only received praise for his histories and asked more than others, because he recalled Marina reprimanding another student for not asking about a sexual history.  It was also alleged that Plaintiff was overly reliant on secondary data in obtaining a history.  However, he was given a medical reference book to use. Thus, he is not sure how the use of a medical reference book was not proper. It was also alleged that he failed to recognize a patient's central clinical problem.   Again, nothing was ever brought to his attention and thus it was impossible to respond too.

76.     It was also alleged that Plaintiff often focused on a single lab abnormality and failed to address the patient's principal concern.  He was never told this once, nor reprimanded, nor is there even one example cited because it did not happen.  It was also alleged that he was unable to convey a clear thought process while writing daily notes and that his thoughts were often scattered and disorganized.  This did not occur and there is not one case cited.

77.     It was also alleged that while discussing cases on the topic at hand he would interrupt rounds with tangential questions. This again did not occur, and there is not one case cited. It was also alleged that he is unwilling to self-reflect upon his assessments or performance and that he disregarded clinical performance feedback from Attendings but not once was his performance discussed, nor did he ever have a single assessment during GI, with an Attending or superior.  You cannot reflect on something that is non-existent. It was alleged that Plaintiff was not receptive to constructive feedback. This is another

16

perfidious claim.  Simply put, this never happened, and not once was this reported to anyone, nor did he ever receive any admonishment, or censure for inappropriate behavior.  Another allegation is that Plaintiff often got stuck on obscure diagnosis that were not at all likely.   Again, this did not occur and there is not one example cited. There are other criticisms of Plaintiff that were unfounded or where he was treated unequally. (Attendance is an example)

78.   Regarding the Endocrine rotation, SGU violated the ADA by not reasonably accommodating Plaintiff. SGU failed to provide a mentor who would check in with Plaintiff on a weekly basis, and as needed.  SGU failed to provide feedback, as quickly as reasonably possible, regarding any problematic behavior or adverse communication issues.  Plaintiff was not given up to 2 hours of protected time each week to meet with his healthcare providers. Plaintiff was not provided, as reasonably available, written syllabi for elective rotations.  Plaintiff was not provided in advance, as reasonably available, required readings and lecture schedules.

79.   Plaintiff spent less than 2 hours with Dr. Geigrich the entire month. During a conversation Geigrich with Plaintiff's psychologist, he attempted to tell Plaintiff's psychologist that he thinks Plaintiff has something more than just ADHD and anxiety reflecting that he regarded Plaintiff as someone who had a disability.  Thus, Dr. Geigrich appears to harbor a discriminatory animus toward Plaintiff.  During the entire rotation, he was given a total of three patients and was on time every day. He missed two days total due to illness.

17

80. Several individuals asked about Plaintiff's medications, commented on his behavior (He is off his meds or other remarks) or made statements about his mental health.  This is evidence that they regarded Plaintiff as having a disability.

81. Plaintiff was regarded as a person with a disability that resulted in him being treated differently than his peers. (not receiving the same number of patients, not receiving the same information or instruction etc.) This is also a violation of the ADA, unless a change in the number of patients was an approved accommodation determined in the interactive process.

82. SGU failed to continue to engage in the interactive process (following the IME).  When new documentation was received (especially since SGU demanded the evaluation) SGU should have re-engaged in the interactive process and considered Plaintiff's requests for accommodation as well as, the recommendations made by the evaluator. This did not take place and is a violation of the ADA.

83. Plaintiff sought reinstatement but reinstatement was conditioned on it being a final warning and not correcting the Internal Medicine, Endocrine and Gastroenterology grades and providing an unconditional release.

84. As a result of the foregoing conduct, CUNY has violated. Section 504, 29 U.S.C.§ 794 and the regulations promulgated thereunder resulting in plaintiff being damaged by subjecting Plaintiff to discrimination due to his disability and perceived disability that caused his dismissal, by failing to reasonably accommodate Plaintiff, and by failing to engage in the interactive process.

## SECOND CLAIM FOR RELIEF

85.   Plaintiff repeats and realleges the allegations contained in paragraph numbered 1

through 84 as if fully set forth at length herein.

86.   This proceeding is pursuant to the Americans with Disabilities Act (ADA) 42

U.S.C. §12182.

87.   This court has concurrent jurisdiction over the subject matter of this proceeding

pursuant to the ADA, 42 U.S.C. § 12188.  In addition, the Court has jurisdiction pursuant

to 28 U.S.C. § 1331.

88.   The Defendant is a public entity as defined by the ADA, 42 USC § 12131 and

is a recipient which receives federal financial assistance as defined by the ADA.

89.   Plaintiff met the essential requirements for the receipt of services but the

access to services was denied solely due to her disability which in turn denied her access

to her education.

90.   The ADA, 42 U.S.C. §12132 was violated because Defendants intentionally

discriminated and showed gross misjudgment against Plaintiff because she was excluded

from participation in and denied the benefit of services and programs and activities and

was otherwise discriminated and retaliated against by solely due to his disability.

91.   The ADA 42 U.S.C. §12132 was violated because Defendants intentionally discriminated

and retaliated against Plaintiff and showed gross misjudgment due to his disability.

92.   As a result of the foregoing conduct, Defendants have violated the ADA, 42 U.S.C.

§12132 and the regulations promulgated thereunder resulting in plaintiff being damaged

by subjecting Plaintiff to discrimination due to his disability and perceived disability that

caused his dismissal, by failing to reasonably accommodate Plaintiff, and by failing to engage in the interactive process.

## THIRD CLAIM FOR RELIEF

93.     Plaintiff repeats, reiterates and re-alleges each and every allegation set forth above with the same force and effect as if more fully set forth herein.

94.     This is a civil action based upon Defendant's violation of the New York State Executive Law 290 et. seq. by discriminating against Plaintiff due to his disability and perceived disability, and by failing to reasonably accommodate Plaintiff's disability and perceived disability.

95.     As a result of the foregoing Defendants violated Executive Law § 296 by subjecting Plaintiff to discrimination due to his disability and perceived disability that caused his dismissal, by failing to reasonably accommodate Plaintiff, and by failing to engage in the interactive process.  As a result of Defendants violating the Executive Law Plaintiff has been damaged.

## FOURTH CLAIM FOR RELIEF

96.     Plaintiff repeats, reiterates and re-alleges each and every allegation set forth above with the same force and effect as if more fully set forth herein.

97.     As a result of the foregoing Defendants violated New York City Administrative Code § 8-107 by subjecting Plaintiff to discrimination due to his disability and perceived disability that caused his dismissal, by failing to reasonably accommodate Plaintiff, and

20

by failing to engage in the interactive process.  As a result of Defendants violating the Executive Law Plaintiff has been damaged.

## **FIFTH CLAIM FOR RELIEF-ART 78**

98.    Plaintiff repeats, reiterates and re-alleges each and every allegation set forth above with the same force and effect as if more fully set forth herein.

99.    At the time of his enrollment, Plaintiff was provided by SGU with SGU's policies regarding academic criteria for graduation and the EEO policies from the school, as well as the appeal procedures in the event of an alleged breach of the agreement. This formed the contract between the Plaintiff and SGU.

100.    The contract was based on the terms and conditions for graduation that were offered by SGU at the time of Plaintiff's enrollment. Implicit in the contract, is to apply the rules uniformly and not to act arbitrarily and capriciously and discriminatorily when applying the policies to a given situation.

101.    SGU by and through its agents breached the contract in the State of New York, and also violated federal, state and local anti-discrimination laws.

102.    But for the discriminatory conduct of SGU, Plaintiff would have graduated with a medical degree.

103.    SGU's conduct is due to Plaintiffs' disability, and perceived disability.

104.    Plaintiff duly appealed his dismissal and has exhausted all internal administrative remedies pertaining to the extension requested and has satisfied all condition precedent prior to commencement of this suit.

105.  As a result of the foregoing, SGU breached the enrollment contract (an implied in fact contract between the parties) with Plaintiff, resulting in Plaintiff being discharged from the program and being damaged. SGU acted arbitrarily and capriciously and in bad faith and violated federal state and local discrimination laws by discharging Plaintiff from the program on or about November 25, 2017 and then although offering Plaintiff reinstatement but failing to correct his grade and put him on final warning, along with an unconditional release.

106.  SGU breached its own terms and conditions set forth for graduation and acted arbitrarily and capriciously, irrationally, and in bad faith toward Plaintiff in dismissing him from SGU. Plaintiff's academic performance met SGUs' academic requirements for graduation.

107.  Despite the fact that Plaintiff met all the academic requirements, and financial requirements, SGU breached the agreement and has otherwise acted arbitrarily and capriciously, irrationally, and in bad faith, by dismissing Plaintiff.

108.  An Article 78 proceeding is appropriate in this case, where Plaintiff is seeking an order of reinstatement, as well as damages. See Eidlisz v New York Univ., 15 N.Y.3d 730, 731 (2010) ("plaintiff seeks an order compelling defendants to award him a degree"); Tedeschi v. Wagner Coll., 49 N.Y.2d 652, 657 (1980) ("She asked for an order reinstating her and for damages."); Matter of Kickertz v New York Univ. 30 Misc.3d 1220(A), 924 N.Y.S.2d 310 (Table), 2011 WL 420690 (N.Y. Sup. Ct. 2011) (seeking reinstatement through Article 78 and damages through plenary action), reversed in part 2012 WL 4815522, 2012 N.Y. Slip Op. 06834 (1st Dep't Oct. 11, 2012) (granting Article 78 petition and noting that plenary action remains sub judice); Rizv v. New York College

of Osteopathic Medicine of New York Institute of Technology, 98 A.D.3d 1049, 1051 (2d Dep't 2012) (Article 78 commenced to "reinstate him as a student" and if he passes his examination, "to award him a degree").

109.   In an Article 78 proceeding for judicial review of a determination of an educational institution, the standard to be applied is whether the action taken by the institution is arbitrary or capricious, or without rational basis or whether the institution has acted in good faith Tedeschi v. Wagner College, *supra;* Pell v. Board of Educ. Union Free Sch. Dist. No. 1, 34 N.Y.2d 222, 356 N.Y.S.2d 833, 313 N.E.2d 321 [1974]. The arbitrary or capricious test has been said to chiefly relate to whether a particular action should have been taken, is justified or is without a foundation in fact or without a sound basis in reason.

110.   It is a matter of essential fairness in the somewhat one-sided relationship between the institution and the individual that when a university has adopted a rule or guideline establishing a disciplinary procedure, that such procedure be substantially observed and that in conducting the inquiry, the university must proceed in good faith. *See Tedeschi v. Wagner College*, 49 N.Y.2d 652, 427 N.Y.S.2d 760, 404 N.E.2d 1302 (1980); Matter of Gray v. Canisius Coll. of Buffalo, 76 A.D.2d 30, 430 N.Y.S.2d 163 [1980] ).

111.   It is well established that judicial review of determinations of educational institutions as to the academic performance of their students can be challenged.  The academic institution's academic determination must not be arbitrary and capricious, irrational, made in bad faith, unconstitutional, or contrary to statute.  Tedeschi v. Wagner Coll.*,* 49 N.Y.2d 652, 427 N.Y.S.2d 760, 404 N.E.2d 1302 (1980); Matter of Olsson v. Board of Higher Educ. of City of N.Y., 49 N.Y.2d 408, 413-414, 426 N.Y.S.2d 248, 402 N.E.2d

1150 (1980); *Matter of Susan M. v. New York Law School*, 76 N.Y.2d 241, 556 N.E.2d 1104, 557 N.Y.S.2d 297 (1990).

112.   "When a university has not substantially complied with its own guidelines or its determination is not rationally based upon the evidence, the determination will be annulled as arbitrary and capricious." Kickertz v. New York Univ., 99 A.D.3d 502, 507-08, 952 N.Y.S.2d 147, 153 (1st Dep't 2012), appeal dismissed, 20 N.Y.3d 1004, 983 N.E.2d 765 (2013) (quoting Matter of Hyman v. Cornell Univ., 82 A.D.3d 1309, 1310, 918 N.Y.S.2d 226 (3d Dept. 2011)).

113.   Further, it well settled law that "when a student is admitted to a university, an implied contract arises between the parties which states that if the student complies with the terms prescribed by the university, he will obtain the degree he seeks". Vought v. Teachers Coll., Columbia Univ., 127 A.D.2d 654 (2nd Dept. 1987).  The rights and obligations of the parties to this contractual relationship flow from "the university's bulletins, circulars and regulations made available to the student, [which] become a part of this contract. Id., *see also* Sweeney v. Columbia University, 704 N.Y.S.2d 617 (2nd Dept. 2000). Among the rights held to be enforceable pursuant to this implied contract, "when a university has adopted a rule or guideline establishing the procedure to be followed in relation to suspension or expulsion that procedure must be substantially observed.'" Tedeschi v. Wagner Coll., 49 N.Y.2d 652, 660 (1980); see also, e.g. McConnell v. Le Moyne College, 25 A.D.3d 1066, 1068-1069, 808 N.Y.S.2d 860, 862 (4th Dep't 2006); Weidemann v. State University of New York College at Cortland, 188 A.D.2d 974, 975-976, 592 N.Y.S.2d 99, 101 (3d Dep't 1992).  A student may have a breach of contract remedy against a university, based on an alleged adverse academic decision, where the

24

challenged determination was arbitrary and capricious, irrational, made in bad faith or contrary to Constitution or statute.   Here the Plaintiff's dismissal was arbitrary and capricious and in bad faith.

114.   While educational organizations may to a large extent order their own affairs, their conduct may not be arbitrary or capricious or violative of applicable constitutions, bylaws, rules or regulations. Christ The King Regional High School v. Catholic High Schools Athletic Ass'n, Diocese of Brooklyn, 624 N.Y.S.2d 755, N.Y. Sup., (1995).

115.   Based on the foregoing SGU breached the implied in fact contract and acted arbitrarily and capriciously and in bad faith.

116.   In this case, SGU's termination of Plaintiff was "so disproportionate to the offense, in the light of all the circumstances, as to be shocking to one's sense of fairness."  Kickertz v. New York Univ., 99 A.D.3d 502, 511, 952 N.Y.S.2d 147, 155-56 (2012) appeal dismissed, 20 N.Y.3d 1004, 983 N.E.2d 765 (2013) (quoting Matter of Pell v. Board of Educ. of Union Free School Dist. No. 1 of Towns of Scarsdale & Mamaroneck, Westchester County, 34 N.Y.2d 222, 233, 356 N.Y.S.2d 833, 313 N.E.2d 321 (N.Y. 1974)).

117.   This is the first application for relief requested herein.

## DEMAND FOR A JURY TRIAL

Plaintiff herein demands a trial by jury of all issues and claims in this actions.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment against Defendants as follows:

1.   Equitable Relief, including but not limited to reinstatement with

reasonable accommodations, expungement of all discriminatory grades,

25

extended time to graduate, and a declaration that the actions taken against the Plaintiff were discriminatory;

2.      Compensatory damages including but not limited to reimbursement for the tuition and related expenses paid to Defendant;

3.      Special damages for a lost career as a result of not obtaining a medical degree, including the salary Plaintiff would have earned if he was conferred a medical degree;

4.      Pain and suffering;

5.      Attorney fees and costs;

6.      Such other and further relief as this court deems just and proper.

Dated: New York, New York
          March 20, 2017

                            Respectfully submitted,


                             Stewart Lee Karlin, Esq.
                            STEWART LEE KARLIN
                            Attorney for Plaintiff
                            111 John Street, 22nd Floor
                            New York, NY 10038
                            (212) 792-9670